## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| GULNAR THAWAR §<br>§<br>Plaintiff, §<br>§<br>vs. §<br>§<br>SOFTWORLD, INC, §<br>§<br>Defendant. § | CIVIL ACTION NO. 4:20-cv-975 |

## PLAINTIFF GULNAR THAWAR'S ORIGINAL COMPLAINT
## FOR EQUITABLE AND MONETARY RELIEF

Plaintiff Gulnar Thawar, by her attorney, files this complaint against Defendant, SoftWorld, Inc., alleging as follows:

## JURISDICTION AND VENUE

1. This action arises under the Title VII of the Civil Rights Act of 1964. 42 U.S.C. 2000e, et seq. Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a), (b).

2. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) and (3) as the events occurred in within the Collin County portion of Plano, Texas, within this District and this Division of this District.

## PARTIES

3. Plaintiff Gulnar Thawar is a resident of and citizen of Texas and the United States.

4. SoftWorld, Inc. is a Massachusetts corporation with its headquarters and nerve center located in Waltham, Massachusetts. It may be served through its registered agent:

Corporation Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - 1 OF 18**

## DEFENDANTS' UNLAWFUL CONDUCT

5. This case is an employment matter where an employer wrongfully terminated an employee based on discrimination based on ethnic origin and religion and/or in retaliation for having opposed discrimination and having filed a discrimination complaint.

6. Plaintiff Gulnar Thawar (Plaintiff or Thawar) began her employment with SoftWorld at the Onshore Development Center in Plano, Texas on July 12, 2019. This was the timeframe when SoftWorld was staffing up a new contract with USAA that required 128 professionals. Thawar was hired on a 3-year contract.

7. Soon after the start of her employment, Thawar became familiar with a discriminatory workplace culture that openly favored people of Indian national origin and Hindu faith.

8. Most or a plurality of employees at SoftWorld's USAA Development Center in Plano are of Indian national origin, and Hindu religious identification. Many are working under H-1B and other visas. Thawar is Pakistani Muslim, and she is a US Citizen.

**History of Indian and Pakistani Ethnic and Religious Violence**

9. The history of conflict and animus between India and Pakistan since these nations' 1947 independence from Britain is well documented.

10. Pakistan is the predominantly Muslim Western section of the prior British Colony occupying the Indian sub-continent. India is the predominantly Hindu nation occupying the central portion of the Indian sub-continent. It has, however, large minority populations of persons practicing the Sikh, Muslim, and Christian religions.

11. Since independence, India and Pakistan have fought more than one active war and have maintained a state of tension close to war on one of the most militarized borders in the world.

12. On February 27, 2019, just months before Thawar started at SoftWorld, Pakistan shot down an Indian MIG-21 Bison aircraft that it alleged was attacking Pakistan in the disputed border area of Kashmir. Many thought this confrontation might lead to a full war, but tensions were eased when Pakistan returned the Indian Air Force pilot who safely ejected from his aircraft.

13. More recently, the cultural tensions between Hindu and Muslims within India have been revealed by a series of riots targeting Muslims. See, e.g., "'Hate Is Being Preached Openly Against Us.' After Delhi Riots, Muslims in India Fear What's Next," *Time,* March 3, 2020, available online at https://time.com/5794354/delhi-riots-muslims-india/

**Thawar Exposed to Anti-Pakistani Bias, Complains, is Demoted, Placed on a PIP and Terminated in under 7-weeks.**

14. An incident occurred on October 30, 2019, when an Indian co-worker of Thawar named Dolly Patel was alleged to have made a racially derogatory comment that "Pakistanis can't code." It is not disputed that Thawar promptly complained about this improper ethnic slur to her manager that same day.

15. Later that same day, Thawar was demoted by the manager to whom she had complained, David Settlage, Delivery Executive. This new position was as an associate level programmer with a reduction in pay to $40/hr. The next day Thawar was demoted again and switched to a new work team.

16. While she was on PIP, she was treated in several unusual ways. For example, among other items, Thawar was required to (a) re-take new hire training; (b) take a course on basic java skills; (c) continue working in her prior job by continuing to code and commit code every day; (d) perform jobs outside of her job title, including (i) prepare documentation related to the "QA tester role" (QA and Programmer functions are different skills), and (ii) train others at SoftWorld (including a senior level H1b visa holder, a senior level F1 student, and a junior level

H4 EAD – each of these three trainees was ethnically of Indian origin). Due to these additional duties during her so-called "training" timeframe, Thawar was required to work overtime and received overtime pay. Additionally, during this time, Thawar was also required to work using "Python" code, which is a completely different coding system than the JAVA she was proficient in and usually worked on. The above was inconsistent with the alleged desire to increase Thawar's abilities and skillset. Rather, it appears that the PIP and these other additional duties may have been a plan to obtain her resignation.

17. Indeed, just five weeks later, on December 6, Thawar was placed on a two-week performance improvement plan (PIP). This PIP was problematic in many ways including its abnormally short duration and the input allowed from the very same colleague that made the originally discriminatory remark.

18. On December 17, 2019, only 11-days into her 14-day PIP, Thawar was fired for allegedly "[v]iolating a Provision of the SoftWorld Onshore Development Center Policies and Guidelines." The guideline for which she had been fired had not been enforced prior to her termination and specifically was unenforced in five recent incidents of known violations by other non-minority co-workers.

**SoftWorld's Investigation Fails to Identify Nature of Pro-Indian and Anti-Pakistani Bias or Take Proper Corrective Action**

19. After the October 30, incident, SoftWorld's HR conducted an investigation. Although Patel denied making the statement, another employee claimed that she had overheard the statement being made. Accordingly, with this mixed evidence of an overt racial slur, SoftWorld determined that corrective action must be taken. However, the action taken was deficient. The only documented action taken by HR was a "follow-up" with the employee who made the racial slur. *See* HR Follow Up Letter from November 27, 2019. This action was not sufficiently substantial to

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - 4 OF 18**

end the discrimination, nor did it successfully provide a workplace free from fear of retaliation and continued bias. Instead of protecting her from future discrimination, it merely accelerated the discrimination that was continuing.

20. Indeed, as the evidence below demonstrates, Thawar's demotion was influenced by the critique of Dolly Patel who held an anti-Pakistani/Muslim bias. At the time of Thawar's demotion, there was no unbiased evidence or any valid reasons for Thawar's demotion. On the contrary, there is much evidence showing Thawar's ability to perform her job well and that she had been recommended for a promotion by a non-Indian co-worker, until Dolly Patel engineered Thawar's demotion.

21. Having determined that there was evidence that Thawar had been subjected to discriminatory animus from a co-worker, SoftWorld should have allowed Thawar to prove proficiency in a discrimination-free environment. Even more, it should have reviewed how Ms. Patel's analysis of Thawar might have negatively biased and injured Thawar's career. It did not do this analysis. Instead, SoftWorld ratified Patel's misconduct by maintaining the demotion Thawar suffered with the participation of Patel, and by approving of Thawar being improperly placed on a performance improvement plan (PIP) just five weeks after being the recipient of the racial slur.

**Thawar Worked in a Discriminatory Environment**

22. Unfortunately, the racially derogative slur that occurred on October 30, 2019 was only an outward manifestation of a lingering problem. The issue was widespread enough to cause multiple former employees to bring discrimination claims regarding the same or similar animosities.

23. While this was the first overtly racial comment Thawar formally complained about, it was not the first racial comment made in the workplace. According to Thawar, and other non-

Hindu and/or Non-Indian employees who faced similar discrimination, racially derogative statements were commonplace at SoftWorld.

**SoftWorld's Discriminatory Environment was Observed by Thawar's Co-Employees in General and Directly Regarding Thawar**

24. For example, Mumtaz Hamdani is another Pakistani Muslim who was employed by SoftWorld. He was employed as a scrum master. A scrum master has the unique position as a team leader to learn the various skill levels of the members of his or her team. Through his experiences as a scrum master at SoftWorld, Mumtaz observed that the environment at SoftWorld appeared to resemble an Indian Caste system, that large volumes of unskilled Indian workers were hired under visas that required specific skills – despite the fact that these mostly Indian employees lacked such skills or other qualifications – and that these workers were trained and promoted when more qualified non-Indian candidates were overlooked, including US citizens.

25. Dolly Patel is the person who was observed stating, "Pakistani's cannot code," and Hamdani was able to observe both Thawar and Dolly. He observed that Dolly has an apparent pro-Indian bias and that she appears to dislike Pakistanis. Indeed, Mumtaz observed that Dolly Patel treated Thawar differently than her Indian co-workers. Specifically, Mumtaz observed Dolly Patel derogatorily raise her voice at Thawar in a way that she would never have done with an Indian co-worker. After this yelling incident occurred, Mumtaz reported it to supervisor David Settle. However, instead of following up on this complaint, Settle responded by asking, "How does that bother you?" Subsequently, Mumtaz believed that valid complaints about the biased working conditions at SoftWorld would go unheeded and that additional complaints were pointless.

26. While it is true that Mumtaz has also filed an EEOC Charge of discrimination against S-oftWorld, the company should not merely dismiss his testimony as coming from a

disgruntled former employee. Not only does his testimony support Thawar's claims, but it is also corroborated by a former co-employee who is not bringing any EEO claims.

27. Specifically, Tamanpreet Gill, who is an Indian Sikh, also served as a scrum master over Thawar. As her scrum master, she was highly aware of both Thawar's skill levels and Patel's. Gill describes Thawar's skill level as follows:

- *"the client (USAA) was very pleased with her work."*
- *"a dependable employee and a hard worker."*
- *"solid problem solving and technical skills.*
- *"always impressed by Gulnar's ability to complete the work ... on time."*
- *"I think, as a 'MID LEVEL PROGRAMMER' she was doing a great job."*

28. In comparison, Gill states the following about Dolly Patel, the worker who was overheard stating that "Pakistanis can't code," and who was the employee whom we allege engineered Thawar's demotion and PIP:

- *"Many time[s] Dolly Patel was lost."*
- *"She did not have the technical or the leadership skills to do her job."*
- *"Many times, Gulnar Thawar has assisted Dolly Patel."*
- *"Many times, Dolly Patel would ask me questions related to programming and I would refer her to Gulnar."*
- *"I have witnessed Dolly Patel taking credit for Gulnar's work."*

29. Gill also will provide important testimony regarding Dolly Patel's work at engineering Thawar's demotion. Specifically, Gill will testify that:

- *During October 15th through October 29th, there was a discussion was being held regarding Gulnar Thawar's promotion.*
- *A tech lead (Lance Jensen) wanted to bring her on as senior level programmer.*
- *Instead, due to false statements Dolly Patel made, Gulnar was demoted.*
- *At the time of Gulnar's demotion, "There was no paper trail to prove that Gulnar lacked skills."*

30. Like Thawar and Hamdani, Gill will testify that from her observations that Patel demonstrated an anti-Pakistani bias, and specifically that "Dolly Patel hated Pakistani Muslims."

**Thawar Has Evidence of Her Superior Skills and Patel's Inadequate Skills**

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - 7 OF 18**

31. Thawar also has documentary evidence that corroborates the potential testimony of Mumtaz Hamdani and Tamanpreet Gill, that, contrary to the biased assertions of Dolly Patel, Thawar has superior skills, especially in comparison to Dolly Patel.

32. For example, attached as Exhibit "A" is a copy of text messages between Thawar and Lance Jensen related to the potential promotion he sought for her. This exhibit shows that Jensen suggested Thawar for a promotion and corroborates Gill's testimony on this topic.

33. Further, attached as Exhibit "B" is a copy of an email chain between Thawar and Dolly Patel. It shows that Patel was lost and needed Thawar's input for Patel to do her job, and it also corroborates the testimony of Mumtaz and Gill that Patel had lower programing skills than Thawar.

34. Also attached is Exhibit "C" are the results of two objective Java tests that demonstrate Thawar's Java skills were at or above the levels needed for a mid-level Java programmer. This corroborates the testimony of Mumtaz and Gill that Thawar had sufficient, if not superior, skills.

**Thawar Files EEOC Charge and Is Warned About Retaliation.**

35. After receiving the PIP, Thawar, believing she was being discriminated against, filed an EEOC charge of discrimination. However, when Jansen found out that she had filed an EEOC complaint, he warned her that if she did not drop her charge of discrimination, that HR would do everything possible to follow her and find any reason possible to terminate her.

**SoftWorld Does Not Enforce the Photography Policy Equally**

36. Other employees from time to time take photographs in violation of the SoftWorld Policies and Guidelines. This is caused by the fact that SoftWorld's computer system prohibits

emails from being sent out of the facility, and thus any of the myriad of items that an employee might properly wish to document can only be done so by this method.

37. For example, Sandhya Dirisinala, an employee of Indian Origin, took a picture of her computer screen containing a photo of a VPN. The photo was then shared on the What's App instant messaging platform. The Indian employee received no ramifications for these actions.

38. Also, Dolly Patel, an employee of Indian Origin and the same employee who made the discriminatory remarks that "Pakistani's can't code," took a picture of the white board in the office, in violation of the same guideline which Thawar was subsequently fired for. Patel received no repercussions.

39. Further, an employee who is a Chinese national used a non-SoftWorld email account to attempt to send protected-USAA code outside the building. However, this employee accidentally sent the email to Thawar. Thawar reported the breach to Dolly Patel, but no action was taken against this employee.

40. Many additional examples of violations of the same guideline for which Thawar was allegedly terminated exist, all without ramification. The largest violation occurred during an Indian Diwali office party where dozens of photos were taken in the office, all in violation of the guideline. Zero employees were fired as a result of the gross violation.

41. Therefore, it appears that SoftWorld improperly singled out Thawar for documenting her discrimination by taking a photograph of her computer screen and falsely claimed she emailed items outside of the facility, which is technically not possible.

42. Furthermore, like the above examples, Thawar's alleged violation had nothing to do with the proclaimed basis for the rule – protecting code. It is not disputed, to our knowledge, that the alleged guideline violation was in relation Thawar taking a photo of an email on her

computer screen from HR which admitted the substance of Thawar's original discrimination complaint. This photograph was of the follow up email from Human Resources that verified her complaint, confirming that another employee had in fact overheard the racially insensitive and factually erroneous statement that "Pakistanis can't code." Thawar took the photo as her only means of preserving evidence for her ongoing EEOC discrimination complaint - that same complaint which her supervisor warned her prior to her termination that, "if she did not drop the EEOC complaint, she would be fired."

43. Accordingly, to the extent that this photograph was the basis of a termination when other photographs were not, it is apparent that a reasonable third-party observer could find that the alleged basis was a pretext for discrimination and/or retaliation.

### Thawar's Problematic PIP is Also Evidence of Retaliation and Discrimination

44. Additionally, the abnormal PIP that was foisted upon Thawar was itself discriminatory and improper. First, the PIP lacked adequate factual basis. As described above, a large portion of the PIP was based on biased employee input from co-workers that included the person who made the discriminatory national origin statement and two-co-workers who were present when the statement was made but denied hearing it. Second, the basis is in contradiction to a co-employee who was seeking Thawar's promotion, Lance Jensen, and was made contrary to the opinions of Tamanpreet Gill and Mumtaz Hamdani that Thawar possessed proper skills.

45. Second, the PIP is factually erroneous and self-contradictory in many ways. For example, it credits Thawar with taking a basic Java training course as evidence of lack of proficiency in basic Java. However, this reasoning is circular as Thawar was required to take the basic Java course and not the advanced course which Thawar preferred. Indeed, the work that Thawar was doing was well beyond basic Java, as shown above. This work included additional

tasks, because many of Thawar's co-workers lacked the skills to do them or required her assistance in doing them.

46. Further, to the extent that Thawar's Java proficiency could have improved with an advanced Java course, the requirement to retake a basic Java course wasted time and did nothing to advance Thawar's Java skills. Instead of allowing Thawar the ability to respond to these errors or take the appropriate course, HR ratified this improper and error-ridden PIP.

47. Third, a 14-day PIP is woefully lacking in time and well below standard HR best practices. Given the nature of Thawar's alleged deficiencies, which are denied, there is no way a reasonable company would have believed a 14-day PIP occurring simultaneously with the Java course would be sufficient to allow Thawar to demonstrate possession of the Java skills that Thawar indeed already possessed. The assertion contained within the PIP's documentation is somehow that Thawar asked for only two-weeks to show she knew her job.

48. To be clear, Thawar never asked for a PIP, much less one with only a 14-day timeframe. Instead, this 14-day PIP must be viewed for what it plainly is: a mere two-week delay to a pre-determined termination in retaliation for complaining of discrimination that was admittedly present.

49. Given this type of institutionalized ratification of the result of discriminatory mistreatment of Thawar, it is not surprising that Thawar continued feeling the ramifications of the improper reduction in pay and position.

50. Thawar was fired on December 17, 2019, in violation of Title VII.

51. A timely charge of discrimination was filed with the EEOC, and this complaint is filed within 90 days of Ms. Thawar's receipt of a right to sue letter, which is dated September 30, 2020.

## THE LAW

52. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, national origin, religion, and other classifications, as well as retaliation based on opposition to activities made unlawful by Title VII.

53. Specifically, 42 U.S.C. § 2000e-2 (a) states:

(a) Employer practices

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

54. Further, 42 U.S.C. 2000e-3 (a) states:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on—the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

55. Compensatory and punitive damages may be awarded in cases involving intentional discrimination based on a person's race, color, national origin, sex, religion, disability, or genetic information.

56. Compensatory damages pay victims for out-of-pocket expenses caused by the discrimination (such as costs associated with a job search or medical expenses) and compensate them for any emotional harm suffered (such as mental anguish, inconvenience, or loss of enjoyment of life). *See e.g., Zamora v. City of Houston*, 798 F.3d 326, 335 (5th Cir. 2016) (compensatory damages included mental anguish, emotional distress, and damage to reputation).

57. Punitive damages may be awarded to punish an employer who has committed a malicious or recklessly indifferent act of discrimination.

58. Specifically, 42 U.S.C. 2000e-5 (g) and (k) state:

(g) Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders

> (1) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

(k) Attorney's fee; liability of Commission and United States for costs

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

59. Additionally, 42 U.S.C. § 1981a states:

(a) RIGHT OF RECOVERY

> (1) CIVIL RIGHTS

**PLAINTIFF'S COMPLAINT FOR EQUITABLE AND MONETARY RELIEF - 13 OF 18**

> In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C. 2000e–2, 2000e–3, 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.
>
> …
>
> (b) COMPENSATORY AND PUNITIVE DAMAGES
>
> (1) DETERMINATION OF PUNITIVE DAMAGES
>
> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

60. In *Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186 (2011), the Supreme Court determined that an employer should be held liable for employment discrimination based on the discriminatory animus of an employee, who influenced, but did not make, the ultimate employment decision.

61. In this case, the discriminatory and/or retaliatory conduct of Dolly Patel, and potentially other Indian and/or Hindu workers' discriminatory treatment was a significant influence in terminating Thawar. Title VII requires the discrimination to be a motivating factor in the termination, and in this instance the discrimination was the motivating factor under the Cat's Paw theory.

62. Cat's Paw theory applies to Title VII claims, as evidenced in *Zamora v. City Of Houston*, 798 F.3d 326, 331-32 (5th Cir. 2015) (holding cat's paw analysis applies in Fifth Circuit to Title VII cases); and, *Holcomb v. Iona Coll*., 521 F.3d 130, 143 (2d Cir. 2008) (holding a Title VII plaintiff can succeed "even absent evidence of illegitimate bias on the part of the ultimate

decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision-making] process" (citation omitted).

63. Under the Cat's Paw analysis, "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision ... so long as the individual shown to have the impermissible bias played a meaningful role" in the employment action. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).

64. When a supervisor or manager takes actions motivated by retaliatory animus that are intended to cause an adverse employment action and do cause that action, this conduct is sufficient to allow the conclusion that the employment decision, even if made by a different actor, is tainted by the same illegal bias or motive. *Zamora*, 798 F.3d at 332 (holding evidence of supervisor's animus was sufficient to show other City actor's decision was illegal).

65. It is evident through her prima facie case for discrimination that Thawar experienced bias towards her Pakistani national origin and her Muslim faith, both of which played a meaningful role in the ultimate decision to terminate her employment. Regardless of the intentions of the final decision maker, the bias of Dolly Patel, and potentially others, appears to be the factual underpinning of SoftWorld's action.

66. Worse, not only was Patel biased, but she also allowed her bias to cloud her judgment and convinced others in SoftWorld that Thawar was deficient when she was not.

67. Indeed, as Lance Jensen suggested, Thawar should have been promoted when Patel instead engineered her demotion. This impermissible discrimination engineered by Patel, and most likely of multiple other individuals at different stages of Thawar's employment process, tainted the ultimate employment decision, and it is more than sufficient to establish that impermissible bias was a motivating factor in her wrongful termination.

## FIRST CLAIM FOR RELIEF
### (Discrimination under Title VII)

68. Plaintiff realleges each allegation set forth in the paragraphs above.

69. Defendant terminated Plaintiff, in whole or in part, because of her national origin (Pakistani) and/or her religion (Muslim).

70. Defendant's termination of Plaintiff was committed with malice or reckless indifference.

71. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendant for wrongful termination based on discrimination in violation of Title VII, 42 U.S.C. 2000e-2(a).

72. Plaintiff seeks and requests that the Court award back pay, that is the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

## SECOND CLAIM FOR RELIEF
### (Retaliation under Title VII)

73. Plaintiff realleges each allegation set forth in the paragraphs above.

74. By reason of the foregoing, Plaintiff hereby asserts a claim against the Defendant for retaliatory discharge Title VII.

75. By reason of the foregoing, Plaintiff hereby asserts a claim against Defendant for wrongful termination in retaliation for filing a claim of discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e-3.

76. Defendant's termination of Plaintiff was committed with malice or reckless indifference.

77. Plaintiff seeks and requests that the Court award back pay, that is the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover Judgment against Defendant with the following relief:

(1) Past and future pecuniary losses, and lost wages from the time of termination until the time of trial;

(2) Equitable reinstatement; or alternatively, if the Court makes an equitable finding that reinstatement is not feasible, that the Court award of the equitable remedy of front pay including loss of wages in the future and loss of future earnings capacity;

(3) Compensatory damages, including damages for past and future mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life, emotional distress, physical distress, damage to reputation, and other nonpecuniary losses;

(4) Punitive damages;

(5) Prejudgment and post-judgment interest at the maximum legal rate;

(6) Costs of Court;

(7) Attorneys' fees; and

(8) All such other and further relief in law or equity to which Plaintiff may be justly entitled.

RESPECTFULLY SUBMITTED,

*/s/ Eric N. Roberson*

Eric N. Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3109 Carlisle Street
Dallas, TX 75204
214-379-0817 Direct
214.969.9099
214.379.0843 Fax
ENR@KilgoreLaw.com